United States District Court
District of Massachusetts

| | |
|---|---|
| Nicholas Perras, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>Trane U.S., Inc., )<br>)<br>    Defendant. )<br>) | Civil Action No.<br>19-11321-NMG |

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises from allegations of non-payment of commissions owed to plaintiff Nicholas Perras ("Perras" or "the plaintiff") by defendant Trane U.S., Inc. ("Trane" or "the defendant"). Pending before the Court are cross-motions for summary judgment. For the reasons below, the plaintiff's motion for summary judgment will be denied. The defendant's motion for summary judgment will be allowed, in part, and denied, in part.

I.  **Background**

From August, 2011, until his termination in February, 2019, Perras worked as an account manager for Trane. Trane is a Delaware corporation engaged in the business of selling heavy equipment. Its principal place of business is in Davidson, North Carolina, but it maintains offices globally, including in Massachusetts, where Perras was employed. As an account

-1-

manager, Perras's primary responsibilities were selling services and equipment to clients and maintaining client relationships. For the performance of those services, Perras was compensated exclusively by commission. At some point during his employment, Perras began to receive a $6,000 monthly draw payment against his future commissions pursuant to Trane's Incentive Compensation Policy ("the Policy").

After his termination in February, 2019, Trane issued a final paycheck to Perras in the amount of approximately $35,700. In addition, on March 1, 2019, Trane accidentally sent Perras his monthly draw disbursement in the amount of $6,000 ("the accidental draw"). Although Trane initially sought reimbursement of the accidental draw, it has since withdrawn that request.

In April, 2019, counsel for Perras sent a demand letter to Trane seeking approximately $167,000 in commissions allegedly due for Perras's work on projects involving: 1) the Acorda Therapeutics Systecon, 2) the Acorda Therapeutics Cooling Tower ("the Cooling Tower project") and 3) Franklin Realty.[1] In May, 2019, Perras sued Trane in Massachusetts state court alleging violations of M.G.L. c. 149, § 148 ("the Wage Act") and seeking

---

[1] Because Perras does not oppose summary judgment on the Acorda Therapeutics Systecon project, the Court will not address it further.

the alleged unpaid commissions. Trane timely removed the action to federal court.

Perras moves for summary judgment on approximately $18,000 in allegedly unpaid commissions relating to the Cooling Tower and Franklin Realty projects, attorney's fees and treble damages under the Wage Act. Trane seeks summary judgment that it owes Perras no commissions or, in the alternative, judgment precluding liability for treble damages.

## II. Motions for Summary Judgment

### a. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in

dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

**b. The Cooling Tower Project**

The Cooling Tower project consisted of the installation, dismantling and rental of a 500-ton cooling tower. The parties agree that when Perras was terminated, he was owed a commission of approximately $5,800 on that project which was not included in his final paycheck. Disputed, however, is whether the issuance of the accidental draw constituted payment of the commission. Perras contends that it did not, and that Trane is liable for a violation of the Wage Act, because an accidental draw is not a wage payment. He further submits that Trane is liable in any event because the draw, if considered to be a

-4-

commission payment, was unlawfully tardy. Trane responds that the accidental draw constituted timely payment of the commission owed and therefore it is not liable under the Wage Act.

With respect to whether the accidental draw was a payment of wages, Perras argues that 1) the accidental draw was a loan and 2) even if the accidental draw were a payment, it was of a different nature than the commission owed to him and therefore did not satisfy Trane's obligation under the Wage Act.

The Court is unpersuaded. First, the accidental draw was a payment within the meaning of the Wage Act. Massachusetts law recognizes draws as a method of payment. See M.G.L. c. 151, § 1A (listing "drawing accounts" along with commissions and bonuses as "sums paid"), Sullivan, 482 Mass. at 228 (describing payment structure for salesperson paid "entirely in commissions or draws (i.e., advances on commissions)").

Second, application of the draw to the commission due does not violate the Wage Act. The draw payment is essentially an advance and has no contemplated application other than as a future earned commission. For that reason, the draw differs from the payments in the cases cited by Perras, Dixon v. Malden, 984 N.E. 2d 261 and Sullivan v. Sleepy's LLC, 121 N.E. 3d 1210 (Mass. 2019), in which a defendant employer attempted to re-allocate as wages a payment given gratuitously or in satisfaction of another legal obligation. No similar re-

allocation has occurred here: Perras alleges he is owed commissions, and draw payments offset commissions and only commissions.

Finally, Perras claims that, regardless of whether the draw was a payment of wages, he is owed treble damages because it was late. The Wage Act provides that any terminated employee shall be paid in full on the day of his or her discharge. M.G.L. c. 149, § 148. Liability for treble damages under the Wage Act attaches, however, only after the filing of a claim. See Dobin v. CIOview Corp., 16 Mass. L. Rep. 785 at *20 (Mass. Super. Ct. 2003) (holding that an employer "is not required to pay treble the lost wages and benefits if the . . . payments were tardy but made before suit was brought"), Clermont v. Monster Worldwide, Inc., 102 F. Supp. 3d 353, 358-59 (D. Mass. 2015) (same). Here, payment in the form of the accidental draw was made before the plaintiff filed suit in state court. Therefore, treble damages are unwarranted to the extent that the accidental draw satisfies Trane's liability which it does as to the Cooling Tower project.

Because Perras has received the commission to which he is entitled, summary judgment will enter for Trane with respect to the Cooling Tower project commission.

### c. The Franklin Realty Project

The Franklin Realty project consisted of a five-year contract for servicing industrial chillers and for other service projects.  It guaranteed Trane revenue of $297,864.67 over five years, $76,012 of which was payable in the first year. Trane argues that Perras is owed about $41 as commission for the Franklin Realty project, an amount reimbursed by the portion of the accidental draw not already allocated to the Cooling Tower project commission.[2]  Perras contends, however, that he is owed $12,542, trebled under the Wage Act.  The sums differ because of the parties' disagreement as to 1) whether the Franklin Realty agreement was a wholly new agreement or, instead, partly a renewal and expansion of a prior agreement and 2) how commissions with respect to new agreements are to be calculated under Perras's Commission Plan Summary ("the Plan Summary") and the Policy.

### i.  Arguments of the parties

Perras argues that his commission for the Franklin Realty project should be calculated pursuant to the "New Agreements" section of the Plan Summary.  That section provides that the commission for the first 12 months of a new agreement is credited to the salesman at the later of the "month of the new

---

[2] For the purpose of simplicity, the Court will round to the nearest dollar all monetary amounts relevant to this case.

-7-

contract start date (revenue recognition event)" and its entry into company data systems. Perras submits that 1) he was credited the agreement before his termination and, accordingly, is owed $12,542, i.e. 16.5% (his commission rate) of $76,012, and 2) Trane's failure to pay that sum constitutes a violation of the Wage Act entitling him to treble damages on that amount.

Trane disagrees and asserts that, with respect to the servicing component, Perras is entitled to commissions under the "Renewals" and "Expanded Scope Agreements" provisions of the Plan Summary. With respect to the service projects, Trane agrees that the "New Agreements" provision governs but maintains that Perras is not entitled to a commission because certain contingencies had not occurred at the time Perras was terminated.

As to the "Renewals" and "Expanded Scope Agreements" provisions, Trane asserts that commissions payable thereunder are credited to the salesperson at the later of the month of the contract start date and the date that the contract was entered into the company contract system. If an employee is terminated before the end of a month, both are prorated to account for the termination date. Trane calculates that the total value of the renewal and expanded scope commissions for the Franklin Realty project for the month of February, 2019, was $228, i.e. the sum of $54 for the renewal commission and $174 for the expanded

scope commission. Because Perras was terminated on February 5, 2019, Trane submits that under the Plan Summary it owes a prorated amount of those commissions, i.e. $41.

With respect to the service projects, Trane contends that, while the contract was entered into company systems in January, 2019, the "revenue recognition event" did not occur until work began on the first project in April, 2019. Trane maintains that the meaning of "revenue recognition event" which is not defined in the Plan Summary, is elucidated by the Policy, which states that revenue for the project portions is "recognized in full the month in which the work is completed." (emphasis supplied) Because no work on the project portion was completed until April, 2019, Perras was not purportedly eligible to receive a commission for the service projects.

Therefore, by Trane's calculation, Perras was owed a prorated portion of his February commissions under the Renewals and Expanded Scope section of the Plan Summary but nothing under the New Agreements section, i.e. a total of $41. Because more than $41 of the accidental draw remains unallocated after accounting for the Cooling Tower project commission, Trane maintains that it has not violated the Wage Act and owes Perras no additional compensation.

### ii. Analysis

Resolution of the Franklin Realty dispute requires interpretation of Perras's employment contract and related Trane policies to determine 1) whether the commission for the Franklin Realty project should be calculated under the "New Agreements" provision of the Plan Summary, as urged by Perras, or under the "New Agreements", "Renewals" and "Expanded Scope Agreements" provisions, as suggested by Trane, and 2) how to calculate the commission owed to Perras, if any, under the operative provision or provisions.

Under Massachusetts law, questions of contract interpretation are ordinarily questions of law for a court. Nadherny v. Roseland Prop. Co., 390 F.3d 44, 48 (1st Cir. 2004). The court must interpret the language of the contract in light of its plain meaning, "giving full effect to the document as a whole." Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 160 (1st Cir. 2005) (quoting Given v. Commerce Ins. Co., 796 N.E.2d 1275, 1277 (Mass. 2003)).

If a contract is unambiguous, the court should decide its proper interpretation, and even if it is ambiguous, the court may still enter summary judgment if the evidence is uncontested or so one-sided that no reasonable person could decide to the contrary. Nadherny, 390 F.3d at 48. The usual rule is, however, that if a contract is ambiguous and a reasonable person could

-10-

interpret it in the manner proposed by the non-moving party, the meaning of the ambiguous terms presents a question of fact for a jury. Id. at 49 (explaining that factfinder should construe contract "so long as the proper interpretation is fairly debatable").

The Court concludes that the Franklin Realty project agreement was partially a renewal and expansion of scope of the previous contract and partially a new agreement. Perras's exhortations notwithstanding, calculation of the commission owed for the Franklin Realty project exclusively under the "New Agreements" provision would demand the wholesale reading out of that provision its requirement that no active agreement exist previously at the customer site. See Okmyansky, 415 F.3d at 160 (instructing that contract must be read as a whole). Rather, the classification consistent with the contract is that the servicing portion of the Franklin Realty project constituted a renewal and modest expansion of scope of the preexisting contract. The service project portion is, however, as both parties have acknowledged, ill-suited to classification under the "Renewals" or "Expanded Scope Agreements" provisions and is a new agreement for the purpose of calculating Perras's commission.

Commissions are wages for the purposes of the Wage Act when they are "definitely determined" and "due and payable" to the

employee. Weems v. Citigroup, Inc., 900 N.E.2d 89, 92 (Mass. 2009). In order to be "definitely determined", a commission must be "arithmetically determinable", and commissions are only "due and payable" under the Wage Act if all contingencies relating to their entitlement have occurred. Gallant v. Boston Exec. Search Assocs., No. 13-12081, 2015 U.S. Dist. LEXIS 76387 at *18 (D. Mass. June 12, 2015).

With respect to Perras's renewal commission, the servicing portion of the Franklin Realty project agreement provided for five years of servicing at predetermined annual prices. Because the value of the renewal portion of the Franklin Realty project was arithmetically determinable, and because its first month was due and payable, Perras is entitled to a commission to that extent.

The Plan Summary provides that, for "Renewals", the monthly commission amounts to the revenue recognized in Trane software for that month, multiplied by the contract's validated gross margin percentage and the commission rate. The "Renewals" commission for February, 2019, was $54, prorated to $10 to account for Perras's February 5, 2019, termination. Because more than $10 of the accidental draw remains unallocated, Perras is not entitled to any additional payment to satisfy the "Renewals" commission.

Perras's expanded scope commission was similarly due and payable by February 5, 2019. It is calculated under the "Expanded Scope Agreements" provision by taking current contract value, subtracting the prior contract value and multiplying that amount by the estimated gross margin percentage and the relevant commission rate. The result is a commission of $174, prorated to $31. As with the "Renewals" commission, because more than $31 of the accidental draw remains unallocated, Perras is not entitled to any additional payment.

Finally, the service project of the Franklin Realty project was a new agreement and thus the commission on that project is calculated under the eponymous provision of the Plan Summary. "New Agreements" are credited and advanced to the employee at the later of 1), "the month of the new contract start date (revenue recognition event)" and 2) the date in which the service contract was entered in company databases. The Franklin Realty project contract was entered into the company systems in January, 2019. Therefore, the dispositive questions with respect to the "New Agreements" commission are whether the "month of the new contract start date (revenue recognition event)" occurred before Perras's termination and whether any other "contingency relating to [his] entitlement" to the commission remained unsatisfied. Gallant at *6.

To resolve those questions, the Court looks to Perras's Plan Summary, and the Policy which it incorporates by reference. See Nadherny, 390 F.3d at 49 (explaining that a court may consider related provisions to "cast light on the meaning of disputed language"). Section 4.1 of the Policy provides, in relevant part, that:

> [u]nless specifically documented differently in the plan participant's plan document . . . crediting for the purpose of calculating achievement of the Plan [Summary's] components occurs when the transaction is recognized by [Trane] for external reporting purposes pursuant to [Trane's] internal financial recognition policies and any external laws, rules and regulations which may govern recognition in the location where the transaction occurs.
>
> . . .
>
> In situations where a customer provides advance payment or prepayment to [Trane], incentive payouts are not earned until such time as [Trane] can financially recognize the prepayment or advance payment based upon actual services rendered or as a percentage of project completion.

Notwithstanding the first paragraph of Section 4.1, Section 1.1 of the Policy provides that its terms control in the event of a conflict between the Policy and "any other communication made to an incentive plan participant."

The Plan Summary provides, in relevant part, that commissions on new service agreements:

> are paid based on validated estimates of gross margins. Estimated gross margin is based on the financial profile of the service agreement in [Trane data systems]. Once revenue and estimated costs are loaded into the financial profile in [Trane data systems] they are considered to be validated. Gross margin is calculated by subtracting the estimated costs from the revenue, in the financial profile.

-14-

> . . .
>
> The plan participant is advanced the first 12 months of commission.  The commission is credited to the plan participant at the later of (1) the month of the new contract start date (revenue recognition event) or (2) the date in which the service contract was entered in [Trane data systems].

(emphasis omitted).  The Plan Summary neither defines nor explains the term "revenue recognition event".

With respect to the meaning of "the month of the new contract start date (revenue recognition event)", the Plan Summary and the Policy fail to provide a harmonious interpretation.  While it is undisputed Franklin Realty project contract began February 1, 2019, it is unclear whether the term "revenue recognition event" displaces the apparently related provisions in the Policy pertaining to the recognition of transactions, refers to them or does neither.  Perras urges the former, i.e. he argues that the month the contract began is the revenue recognition event.  His interpretation, however, assigns considerable significance to an insignificant parenthetical phrase and thus ignores the Policy's instruction that its crediting provision governs "[u]nless specifically documented differently".  In addition, Perras would disregard a detailed set of provisions for recognizing payments which account for external reporting and other obligations in favor of date-based recognition that does not address any such concerns.

While Trane, unlike Perras, strives to read the Plan Summary and the Policy in unison, its proffered interpretation fares no better.  Trane functionally would impose a third condition, recognition of the transaction for external reporting purposes, upon the Plan Summary's two-part crediting requirement and, as collateral damage, would render the "revenue recognition event" parenthetical a nullity. See Providence Journal Co. v. Providence Newspaper Guild, 271 F.3d 16, 21 (1st Cir. 2001) (stating "basic principle of contract law" that constructions which "render contract terms meaningless should be avoided").

Trane further contends that, in any event, other contingencies remain unsatisfied and therefore Perras is not owed a commission for the service projects.[3]  In particular, it argues that the initial payment of $76,012 was "nothing more than an advance payment" unable to be recognized.  Trane is correct that the Policy conditions recognition of advance payments only "upon actual services rendered or as a percentage of project completion" but that language (which, unlike the first paragraph of Section 4.1, contemplates no exceptions) is at odds with the "New Agreements" provision of the Plan Summary which states, in bold, italicized font, that Perras is to be

---

[3] Trane also asserts, in passing, that it could deny Perras any commissions owed because he was terminated for cause but that argument is undeveloped and therefore the Court declines to consider it further.

advanced the first 12 months of commission for a new agreement upon the satisfaction of the Plan Summary's ambiguous crediting requirements. Trane attempts to reconcile those provisions by distinguishing their verbs: whereas the last paragraph of Section 4.1 discussions "earned" commissions, the "New Agreements" provision refers to them as "advanced" and "credited". The merit of that argument, if any, does not negate the ambiguity of Policy and the Plan Summary that leaves those terms undefined and employs them with little apparent distinction.

Finally, while the Court may consider extrinsic evidence in ruling upon motions for summary judgment, here such evidence is mixed and therefore of minimal assistance. See Nadherny, 390 F.3d at 49. (stating that summary judgment may enter despite ambiguities only where evidence is "so one-sided that no reasonable person could decide to the contrary").

Because a reasonable factfinder could interpret the contractual language in favor of either party, summary judgment will not enter on Perras's Wage Act claims with respect to the service project portion of the Franklin Realty project agreement.

## ORDER

For the foregoing reasons,

1) plaintiff's motion for summary judgment (Docket No. 54) is **DENIED**; and

2) defendant's motion for summary judgment (Docket No. 68) is, with respect to plaintiff's Wage Act claims pertaining to commissions allegedly owed for the Acorda Therapeutics Systecon and Cooling Tower projects and the servicing portion of the Franklin Realty project, **ALLOWED**, but with respect to the service projects portion of the Franklin Realty project, **DENIED**.

**So ordered.**

                                               /s/ Nathaniel M. Gorton
                                                Nathaniel M. Gorton
                                                United States District Judge

Dated January 6, 2022.